## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

ACQUEST HOLDINGS, INC.

|  |  |
|---|---|
| Plaintiff, | **Civil Action No. 16-CV-00212** |

     -against-

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA

                    Defendant.

-----------------------------------------------------------------X

---

## MEMORANDUM OF LAW BY TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

---

MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
Wall Street Plaza
88 Pine Street, 24th Floor
New York, New York 10005
T. (212) 483-9490
F. (212) 483-9209

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………….…………iii

PRELIMINARY STATEMENT……………………………………………………………….1

STATEMENT OF FACTS……………………………………………………………………..1

STANDARD OF REVIEW……………………………………………………………………5

ARGUMENT……………………………………………………………………………......6

      THE PLAINTIFF'S COMPLAINT IS SUBJECT TO DISMISSAL, AS A MATTER OF LAW, DUE TO PLAINTIFF'S FAILURE TO COMPLY WITH CONDITIONS PRECEDENT TO COVERAGE……….6

CONCLUSION…………………………………………………………………………..16

<strong><u>TABLE OF AUTHORITIES</u></strong>

*Am. Home Assur. Co. v. Republic Ins. Co.*,
984 F.2d 76 (2d Cir. 1993)………………………………………………………………...7

*America Sur. Co. v. Pauly*,
170 U.S. 133 (1898) …………………………………………………………….........10

*Avery & Avery, P.C. v. Am. Ins. Co.*,
51 A.D.3d 695, 858 N.Y.S.2d 319 (2d Dep't 2008)………………………………………...7

*Balkum v. Leonard*,
65 F. Supp. 3d 367 (W.D.N.Y. 2014) ……………………………………………1, 5, 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ………………………………………………………………....6

*Broad St., LLC v. Gulf Ins. Co.*,
37 A.D.3d 126, 832 N.Y.S.2d 1 (1st Dept. 2006)………………………………………….7

*Chicago Ins. Co. v. Halcond*,
49 F. Supp. 2d 312 (S.D.N.Y. 1999) …………………………..……………………………7

*Deso v. London & Lancashire Indem. Co. of Am.*,
3 N.Y.2d 127, 143 N.E.2d 889 (1957) ……………………………………………………7

*Evangelos Car Wash, Inc. v. Utica First Ins. Co.*,
45 A.D.3d 727, 845 N.Y.S.2d 458 (2d Dep't 2007)………………………………………..7

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
639 F.3d 557 (2d Cir. 2011) ……………………………………………………………6, 7

*Goldstein v. Pataki*,
516 F.3d 50 (2d Cir.2008) ………………………………………………………………...6

*Heydt Contracting Corp. v. Am. Home Assur. Co.*,
146 A.D.2d 497, 536 N.Y.S.2d 770 (1st Dept. 1989)………………………………………7

*Indian Harbor Ins. Co. v. City of San Diego*,
972 F. Supp. 2d 634, 650 (S.D.N.Y. 2013)
*aff'd*, 586 F. App'x 726 (2d Cir. 2014)……………………………………………………8

*Lockheed Martin Corp. v. Retail Holding, N.V.*,
639 F.3d 63 (2d Cir. 2011) ………………………………………………………………7

*Minasian v. IDS Prop. Cas. Ins. Co.*,
No. 14-CV-10125-KBF, 2015 WL 8485257 (S.D.N.Y. Dec. 9, 2015)……………………..7, 15

*Mount Vernon Fire Ins. Co. v. DLRH Associates*,
967 F. Supp. 105, 111 (S.D.N.Y. 1997)
*aff'd sub nom. Mount Vernon Fire Ins. Co. v. Henry*, 152 F.3d 919 (2d Cir. 1998)……………..11


*Newman & Schwartz v. Asplundh Tree Expert Co.*,
102 F.3d 660 (2d Cir.1996)……………………………………………………………………..1, 5


*Pfeffer v. Harleysville Grp., Inc.*,
No. 10-CV-1619 ALC, 2011 WL 6132693 (E.D.N.Y. Sept. 30, 2011)
*aff'd,* 502 F. App'x 28 (2d Cir. 2012)……………………………………………………..7, 8


*Power Auth. v. Westinghouse Elec. Corp.*,
117 A.D.2d 336, 502 N.Y.S.2d 420 (1st Dep't 1986)………………………………………..8, 15


*Public Service Mut. Ins. Co. v. Levy,*
87 Misc.2d 924, 387 N.Y.S.2d 962 (Sup.Ct.N.Y.Co.1976),
*aff'd,* 57 A.D.2d 794, 395 N.Y.S.2d 1 (1st Dep't 1977)……………………………………11


*Response Pers., Inc. v. Hartford Fire Ins. Co.*,
812 F.Supp.2d 309 (S.D.N.Y. 2011)………………………………………………………..6


*Ruotolo v. City of New York,*
514 F.3d 184 (2d Cir.2008)…………………………………………………………………..5


*Security Mut. Ins. Co. v. Acker-Fitzsimons Corp.*,
31 N.Y.2d 436, 340 N.Y.S.2d 902 (1972)…………………………………………………11


*Sparacino v. Pawtucket Mutual Ins. Co.*,
50 F.3d 141 (2d Cir.1995)…………………………………………………………………..7


*Turkmen v. Ashcroft,*
589 F.3d 542 (2d Cir.2009)…………………………………………………………………6


*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies,*
748 F.2d 118 (2d Cir. 1984)………………………………………………………..*Passim*


*White by White v. City of New York,*
81 N.Y.2d 955, 598 N.Y.S.2d 759, 615 N.E.2d 216 (1993)……………………………..11


*Wright v. Orleans Cty.*,
No. 14-CV-00622A F, 2015 WL 5316410 (W.D.N.Y. Sept. 10, 2015)…………………….6


*Young v. Corcoran,*
14-CV-6526-EAW, 2016 WL 899235 (W.D.N.Y. Feb. 19, 2016)……………………..2, 5

# PRELIMINARY STATEMENT

The Defendant, Travelers Casualty and Surety Company of America ("Travelers"), respectfully submits this Memorandum of Law in support of its Motion to Dismiss, pursuant to Rule 12(B)(6) of the Federal Rules of Civil Procedure. Pursuant to the express terms of the Wrap+ Crime Insurance Policy issued by Travelers to the Plaintiff, Acquest Holdings, Inc. (the "Plaintiff"), incorporated by reference in the Plaintiff's Complaint, the Plaintiff was obligated to comply with certain conditions precedent to coverage, including, *e.g.,* providing timely notice of claim and timely Proof of Loss. Under New York law (discussed *infra*), an insured's failure to comply with the aforesaid conditions precedent to coverage relieves the insurer, as a matter of law, from any obligation to provide insurance coverage for the belatedly noticed claim.

In the matter at bar, the Plaintiff submitted notice of claim and a Proof of Loss to Travelers no less than eleven (11) months after it discovered the loss. Therefore, for the reasons discussed fully herein, Travelers respectfully submits that the Plaintiff's Complaint should be dismissed with prejudice because it fails to state a claim upon which relief may be granted.

# STATEMENT OF FACTS

The following factual recitation has been abstracted from the Plaintiff's February 5, 2016 Complaint and the documents specifically incorporated by reference therein. *See, e.g., Balkum v. Leonard*, 65 F. Supp. 3d 367, 369 (W.D.N.Y. 2014) (citing *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996)); *see also, Young v. Corcoran,* 14-CV-6526-EAW, 2016 WL 899235 (W.D.N.Y. Feb. 19, 2016).

The Plaintiff submitted notice of claim to Travelers on or about February 1, 2015 regarding an alleged fraudulent scheme perpetrated by a former employee of Acquest Vegas, LLC, Brian Vanderburgh ("Vanderburgh"), in connection with a construction project in which

Vanderburgh served as Construction Manager. (Plaintiff's Complaint ("Cmp"), ¶ 26). The policy applicable to the Plaintiff's claim – *i.e.,* the Wrap+ Crime Insurance Policy (No. 104885918) (the "Policy") issued by Travelers for the policy period of November 9, 2013 – November 9, 2014 – identifies Acquest Vegas, LLC, as an additional insured. (Cmp. ¶¶ 4-5).[1]

On February 10, 2015, the Plaintiff submitted a Sworn Proof of Loss, alleging that its loss totaled $281,065.10. (Cmp. ¶ 27).[2] On June 4, 2015, the Plaintiff subsequently submitted a revised Proof of Loss, alleging that its loss had increased to $507,638.00. (Cmp. ¶ 29).[3]

The Plaintiff claims that Vanderburgh, while employed as the Construction Manager for Acquest Vegas, LLC, in regard to a construction project in Las Vegas, Nevada (the "Project"), hired a company identified as Recreation Development Company of Las Vegas ("RDC") to serve as the Project's General Contractor. (Cmp. ¶¶ 9-11). During the course of the Project, Vanderburgh allegedly colluded with RDC's owner, Jeffrey Whittle, to embezzle Project funds for their own personal use and benefit. (Cmp. ¶ 14).

On March 1, 2014, the Plaintiff's Vice President, Michael Huntress, received a telephone call from a former RDC employee, who reported that Vanderburgh had been paid illicit kickbacks from RDC on the Project. (Cmp. ¶ 16). After receiving this call, Mr. Huntress, on or about March 1, 2014, contacted two (2) additional RDC employees, who both indicated that they believed Vanderburgh had received kickbacks from RDC. (Cmp. ¶ 17). Subsequently, on March 10, 2014, the Plaintiff's Vice President, Mr. Huntress, contacted the Las Vegas Metropolitan Police Department and filed a Police Report regarding Vanderburgh's alleged fraud. (Cmp. ¶

---

[1] A true and accurate copy of the Policy, incorporated by reference in Plaintiff's Complaint, is attached as Exhibit "A" to the Declaration of Adam R. Schwartz (the "Schwartz Dec.").

[2] A true and accurate copy of the February 10, 2015 Proof of Loss, incorporated by reference in Plaintiff's Complaint, is attached as Exhibit "B" to the Schwartz Dec.

[3] A true and accurate copy of the June 4, 2015 revised Proof of Loss, incorporated by reference in Plaintiff's Complaint, is attached as Exhibit "C" to the Schwartz Dec.

18).[4] The March 10, 2014 Police Report, incorporated by reference in the Plaintiff's Complaint, stated the following:

> PR [Person Reporting] states his business receive[d] a phone call about a week ago from a previous employee of RDC who claims Brian Vanderburgh had stolen $200,000 – $300,000 from PR when he worked as Project Manager for PR in 2011. PR states he did have a project at sec of N.Rancho/Alexander which is now a VA outpatient clinic in which Brian Vanderburgh was the Project Manager. PR reviewed the paperwork and invoices and discovered fictitious invoices and external overcharges paid to RDC. PR states Brian Vanderburgh works for RDC. One example he had was one of the companies.[5]

According to the Plaintiff's pleadings: the Plaintiff's Vice President, Mr. Huntress, thereafter provided "certain of its [unidentified] business records" to the Las Vegas Metropolitan Police Department; the Las Vegas Metropolitan Police Department "apparently contacted the Nevada State Contractors Board (NSCB) regarding the investigation of Mr. Vanderburgh and RDC"; and on or about December 16, 2014, the NSCB served a "Notice of Hearing" and supporting documents on Plaintiff and RDC regarding the Vanderburgh/RDC fraudulent scheme. (Cmp. ¶¶ 21-24).

The NSCB's "Notice of Hearing", incorporated by reference in the Plaintiff's Complaint, contains numerous Exhibits, including a March 13, 2014 "Voluntary Statement" provided by the Plaintiff's Vice President, Mr. Huntress, to the Las Vegas Metropolitan Police Department.[6] The "Voluntary Statement" states the following:

> I received a call from Greg Hiner, on February 28, 2014, the project manager who finished the VA project for RDC. It was late 1130 PM when he called and I let the call go to voicemail. I listened to the message the following morning (Mar. 1, 2014).

---

[4] A true and accurate copy of the March 10, 2014 Police Report, incorporated by reference in Plaintiff's Complaint, is attached as Exhibit "D" to the Schwartz Dec.

[5] *Id.*

[6] A true and accurate copy of the NSCB's Notice of Hearing, incorporated by reference in Plaintiff's Complaint, is attached as Exhibit "E" to the Schwartz Dec. (*See,* pp. 56-57).

"Hey Michael Greg Hiner it is 830 my time probably 1130 yours, hey give me a call tomorrow [ ] um your gonna want to give me a call, got some information for ya your going to want to hear." [Sic]

I reached out to Greg Saturday a couple of times before I spoke to him. Once I reached him, he shared with me that his previous employer RDC and our project manager Brian Vanderburgh had been conspiring to pad construction line items with false invoices from vendors. He stated that the invoices easily totaled over $300,000 and that RDC was doing this and making payments to BVD a company owned by our project manager Brian Vanderburgh. He went on to say that at the end of the job when we were reviewing final numbers and attempting to closeout the job, that the invoices we were fighting from Top Notch specifically were falsified…[7]

Although the Plaintiff clearly discovered its loss by no later than March 13, 2014, the Plaintiff admits that it did not notify Travelers of its claimed loss until February 1, 2015 (Cmp. ¶ 26); and did not file its Proof of Loss until February 10, 2015 (Cmp. ¶ 27)[8] – which it revised on June 4, 2015 (Cmp. ¶ 29).[9]

On June 29, 2015, Travelers notified the Plaintiff, *via* letter of even date, that Plaintiff's claim was being denied as a result of the Plaintiff's failure to comply with conditions precedent to coverage expressly set forth in the Policy. (Cmp.¶ 30). Pursuant to Travelers' aforesaid June 29, 2015 letter, incorporated by reference in the Plaintiff's Complaint, Travelers recited the relevant claim history, including, *e.g.,* that the Plaintiff's Vice President, Mr. Huntress, filed the above-referenced Police Report on March 10, 2014; that Mr. Huntress contacted the NSCB's Director of Investigations, Paul Rozario, *via* letter dated July 3, 2014, to provide documents and information regarding the alleged fraud committed by Vanderburgh and RDC; and that Mr. Huntress also provided a memorandum to Mr. Rozario of the NSCB, indicating that prior to the

---

[7] *Id.*
[8] See Exhibit "B" to the Schwartz Dec.
[9] See Exhibit "C" to the Schwartz Dec.

commencement of construction on the Project (and, therefore, prior to the alleged Vanderburgh/RDC fraud), the Plaintiff had received information indicating that Vanderburgh and RDC had previously been involved in *another* fraudulent scheme on a prior construction project in or about 2012.[10]

## STANDARD OF REVIEW

In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), "a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Balkum v. Leonard*, 65 F. Supp. 3d 367, 369 (W.D.N.Y. 2014) (citing *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996)); *see also, Young v. Corcoran,* 14-CV-6526-EAW, 2016 WL 899235 (W.D.N.Y. Feb. 19, 2016). A district court "should consider the motion 'accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor.'" *Id.* at 369-70 (citing *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008)). In order to withstand dismissal, "a plaintiff must set forth 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 370 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).

A claim will be deemed to have "facial plausibility" when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 370 (citing *Turkmen v. Ashcroft,* 589 F.3d 542, 546 (2d Cir.2009)). However, "[a]lthough 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Wright*

---

[10] A true and accurate copy of Travelers' June 29, 2015 letter, incorporated by reference in Plaintiff's Complaint, is attached as Exhibit "F" to the Schwartz Dec.

*v. Orleans Cty.,* No. 14-CV-00622A F, 2015 WL 5316410, at 6 (W.D.N.Y. Sept. 10, 2015).

Accordingly, "at a bare minimum, the operative standard requires the plaintiff [to] provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Balkum,* 65 F.Supp. at 370 (citing *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008)).

## ARGUMENT

### THE PLAINTIFF'S COMPLAINT IS SUBJECT TO DISMISSAL, AS A MATTER OF LAW, DUE TO PLAINTIFF'S FAILURE TO COMPLY WITH CONDITIONS PRECEDENT TO COVERAGE

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." *Response Pers., Inc. v. Hartford Fire Ins. Co.,* 812 F.Supp.2d 309, 314 (S.D.N.Y. 2011) (citing *Fed. Ins. Co. v. Am. Home Assurance Co.,* 639 F.3d 557, 567 (2d Cir. 2011)). Pursuant to this approach, "[a]n insurance contract is ambiguous if its terms are 'susceptible of two reasonable interpretations.'" *Id.* at 314. By contrast, "an insurance contract 'is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion.'" *Id.* at 314 (citing *Lockheed Martin Corp. v. Retail Holding, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011)); *see also, Broad St., LLC v. Gulf Ins. Co.,* 37 A.D.3d 126, 131, 832 N.Y.S.2d 1 (1st Dept. 2006). The question of "whether the language of a contract is clear and ambiguous is one of law, and therefore must be decided by the court." *Id.* at 314 (citing *Fed. Ins. Co.,* 639 F.2d at 568). Importantly, "[m]ere assertions by one that contract language means something to him, when it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *Id.* at 314 (citing *Broad St., LLC,* 37 A.D.3d at 131).

Further, it is well settled under New York law that, "[c]ompliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy[;]" and, "[t]he failure to comply with the notice requirement 'relieves the insurer of liability.'" *Pfeffer, supra* at 3 (citing *Sparacino v. Pawtucket Mutual Ins. Co.,* 50 F.3d 141, 143 (2d Cir.1995); and *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies,* 748 F.2d 118 (2d Cir. 1984)). "New York courts have routinely held that when an insurance policy requires notice to be provided as soon as practicable, delays of as little as one to four months were not within a reasonable period of time as a matter of law." *Minasian v. IDS Prop. Cas. Ins. Co.*, No. 14-CV-10125-KBF, 2015 WL 8485257, 6 (S.D.N.Y. Dec. 9, 2015) (citing *Am. Home Assur. Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. 1993) (36 day delay deemed untimely); *Chicago Ins. Co. v. Halcond*, 49 F. Supp. 2d 312, 320 (S.D.N.Y. 1999) (36 day delay deemed untimely); *Deso v. London & Lancashire Indem. Co. of Am.*, 3 N.Y.2d 127, 131, 143 N.E.2d 889 (1957) (51 day delay deemed untimely); *Avery & Avery, P.C. v. Am. Ins. Co.*, 51 A.D.3d 695, 697, 858 N.Y.S.2d 319 (2d Dep't 2008) (four month delay deemed untimely); *Evangelos Car Wash, Inc. v. Utica First Ins. Co.*, 45 A.D.3d 727, 727, 845 N.Y.S.2d 458 (2d Dep't 2007) (three and a half month delay deemed untimely); *Heydt Contracting Corp. v. Am. Home Assur. Co.*, 146 A.D.2d 497, 499, 536 N.Y.S.2d 770 (1st Dept. 1989) (four month delay deemed untimely); *Power Auth. v. Westinghouse Elec. Corp.*, 117 A.D.2d 336, 502 N.Y.S.2d 420 (1st Dep't 1986) (53 day delay deemed untimely)).

Under New York law, an insurer seeking to assert a "late notice" defense need <u>not</u> establish that it was prejudiced by the late notice of claim, except in circumstances involving a claim made under a liability insurance policy issued after January 17, 2009. *See,* N.Y. Ins. Law § 3420 (McKinney). In other words, for all other insurance policies – including first-party

Commercial Crime Policies of the type at issue herein – New York continues to adhere to a strict "no prejudice" rule. *See, e.g., Pfeffer v. Harleysville Grp., Inc.*, No. 10-CV-1619 ALC, 2011 WL 6132693, 3 (E.D.N.Y. Sept. 30, 2011) *aff'd,* 502 F. App'x 28 (2d Cir. 2012) (holding that, "[t]he insurance carrier does <u>not</u> need to show it was prejudiced by the lack of notice before it can deny coverage.") (emphasis added).[11]

Accordingly, controlling precedent governing "late notice" in the context of Commercial Crime Insurance Policies, *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies,* 748 F.2d 118 (2d Cir. 1984), applies to the matter at bar, and requires that the Plaintiff's action be dismissed.

In *Utica,* the plaintiff, Utica Mutual Insurance Company ("Utica"), filed suit against its fidelity insurer, Fireman's Fund Insurance Companies ("FFIC"), seeking to be indemnified for $802,000 in commissions paid by Utica to a broker-dealer, Hoffman Kavanaugh Securities Corp. ("HKS"), which resulted from certain illegal securities transactions facilitated by Utica's investment manager, Philip Turner ("Turner"). *Id.* at 120. The securities transactions first came to light in December of 1978 when an employee of Utica reviewed Utica's bond portfolio and noticed that a substantial number of taxable bonds had been purchased at prices that were considerably higher than the market rate. *Id.* at 120. The Utica employee immediately notified Utica's chairman of the irregularities, and in January of 1979, Utica's president was also informed of the problem. *Id.* at 120. On January 24, 1979, Utica's president and chairman met with Turner to discuss the issue; and after an investigation had been completed, Turner was terminated in February of 1979. *Id.* at 120.

---

[11] S*ee also, Indian Harbor Ins. Co. v. City of San Diego*, 972 F. Supp. 2d 634, 650 (S.D.N.Y. 2013) *aff'd,* 586 F. App'x 726, 650-51 (2d Cir. 2014) (holding that, "[i]f it were contrary to New York public policy to apply the no-prejudice rule, as the defendants argue, there is no reason why New York courts would continue to apply the no-prejudice rule to policies falling outside the ambit of Section 3420(a)(5)[;]" "[t]he question of whether to abolish the common-law no-prejudice rule is therefore a pure matter of public policy for the Legislature and courts of New York to decide[;]" and "[u]ntil this occurs, the notice-prejudice rule of Section 3420(a)(5) sweeps no more broadly than the terms of the statutory provision itself, which is limited to [liability] policies issued or delivered in New York after January 17, 2009.").

On February 22, 1979, Utica's Audit and Finance Committee met to discuss the problem, and during that meeting, a memorandum was circulated outlining the facts that were then known about the securities transactions at issue. *Id.* at 120. From the end of the February 22, 1979 meeting until July 23, 1979 (when Utica first provided notice of its claim to FFIC) Utica continued to investigate the matter. *Id.* at 120. FFIC denied Utica's claim on the basis that Utica breached a condition precedent to coverage by failing to timely provide notice of the claim, and the instant action ensued.

The district court in *Utica* found that by February 22, 1979, "Utica had enough information to have reasonably determined that a loss had occurred as a result of Turner's misconduct and that the notice requirement was therefore triggered at that time." *Id.* at 121. Because Utica had failed to give notice to FFIC until approximately six months later (on July 23, 1979), the trial court held that Utica had failed to comply with the fidelity bond's notice provisions, and therefore, the district court dismissed Utica's complaint. *Id.* at 121.

On appeal, the Second Circuit stated that, "[a]n insurance company is entitled to require notice at the earliest time practicable after a loss has occurred[;]" and that, "[p]rompt notice permits the insurer to investigate the facts on which the claim is predicated and to adjust its books in order to maintain a proper reserve fund in light of the insured's claim." *Id.* at 121. The Second Circuit held that, "[t]he fidelity bond involved in this case required Utica to notify [FFIC] of any loss 'as soon as practicable,' which simply means that notice had to be given within a reasonable time of the discovery of loss." *Id.* at 121. The Second Circuit stated that, "[w]]hether Utica complied with the notice provisions, therefore, depends on when Utica discovered that there had been misconduct resulting in a loss." *Id.* at 121.

Utica argued that the district court erred in determining when the loss was discovered because "the court failed to give adequate consideration to Utica's subjective conclusions concerning the known facts." *Id.* at 121. The Second Circuit explained that, "[t]he court below held that Utica had discovered the loss by February 22, 1979, because, by that date, Utica's officers 'were in full possession of the information necessary for them to have determined that a loss had occurred.'" *Id.* at 121. Utica argued that although it knew the material facts concerning the transactions at issue by February 1979, it did not discover the loss, as a matter of law, until July 1979 because: (1) it maintained a good faith and reasonable belief in Turner's honesty until July, and (2) it did not recognize the significance of the facts until that date. *Id.* at 121.[12]

However, the Second Circuit held that, "Courts have consistently held that a loss is discovered once an insured has obtained facts that would cause a reasonable person to recognize that there had been dishonesty or fraud resulting in a loss." *Id.* at 121-22 (Citing *America Sur. Co. v. Pauly,* 170 U.S. 133, 147 (1898). The Second Circuit held further that, "New York law, which governs in this case, also requires that the time of discovery be determined according to an objective test, based on the conclusions that a reasonable person would draw from the facts known to the insured." *Id.* at 122 (citing *Security Mut. Ins. Co. v. Acker-Fitzsimons Corp.,* 31 N.Y.2d 436, 340 N.Y.S.2d 902 (1972)).

With regard to Utica's "good faith" defense, the Second Circuit held that such defense was "vitiated by its knowledge of the facts and its duty to inquire." *Id.* at 122; *see also, Mount Vernon Fire Ins. Co. v. DLRH Associates*, 967 F. Supp. 105, 111 (S.D.N.Y. 1997) *aff'd sub nom. Mount Vernon Fire Ins. Co. v. Henry*, 152 F.3d 919 (2d Cir. 1998) (holding, "New York courts have repeatedly rejected conclusory allegations by an insured that its decision not to notify its

---

[12] By contrast, in the matter at bar, the Plaintiff submitted its detailed criminal complaint against its former employee with the Las Vegas Metropolitan Police Department in March 2014, some eleven (11) months before notifying Travelers.

insurer was based on a 'good faith' belief of nonliability[;]" and, "[t]his is especially true in cases where the insured fails to make any investigation of the incident or loss.").[13] The Second Circuit held that, "[t]he unusual nature of adjusted trading in this case, together with Turner's unauthorized conduct, was sufficient to have alerted a reasonable person to the fact that there may have been dishonesty or fraud." *Id.* at 122. Furthermore, the Second Circuit held that, "Utica's good faith belief in Turner's honesty was unreasonable in light of the information Utica had acquired by February [1979]." *Id.* at 122. The Second Circuit also held that, "if Utica was uncertain of the legality of Turner's conduct, then Utica should have promptly obtained legal advice as part of its general inquiry into the transactions in question." *Id.* at 122.

With regard to Utica's second defense – *i.e.,* that it was not required to give notice based solely on a hunch or intuitive feeling that there had been misconduct – the Second Circuit held that, "[a]lthough Utica is correct that mere suspicions do not trigger the notice requirement, an insured cannot disregard the known facts." *Id.* at 123. The Second Circuit held that, "[w]hen the insured learns the facts constituting the alleged dishonesty, his prior suspicions, if any, are converted to knowledge which he cannot ignore and which constituted 'discovery.'" *Id.* at 123. The Second Circuit explained that, "although the initial exposure of irregularities in Utica's bond portfolio – in December 1978 – may have given rise to mere suspicions, once Utica knew the facts upon which this claim is predicated – by the end of February 1979 – Utica's suspicions were transformed into knowledge constituting discovery." *Id.* at 123.

---

[13] *See, e.g., White by White v. City of New York,* 81 N.Y.2d 955, 598 N.Y.S.2d 759, 760–61, 615 N.E.2d 216, 217–18 (1993) (without investigation there can be no conclusory allegation of good-faith belief in nonliability); *Public Service Mut. Ins. Co. v. Levy,* 87 Misc.2d 924, 387 N.Y.S.2d 962, 966 (Sup.Ct.N.Y.Co.1976) ("In order for a belief of non-liability to excuse late notice, the insured must act reasonably, which in turn requires that its belief be implemented by whatever investigation be made under the circumstances by a prudent man"), *aff'd,* 57 A.D.2d 794, 395 N.Y.S.2d 1 (1st Dep't 1977).

The Second Circuit held that, "[a]dopting Utica's arguments concerning when a loss is discovered would broaden the definition of discovery and would effectively eliminate the insured's duty to inquire into the facts." *Id.* at 123. In addition, "[i]t would permit the insured to avoid making a reasonable assessment of the information presented, and would undermine the ability of the insurer to make a timely investigation and adjust its reserve funds." *Id.* at 123. Accordingly, the Second Circuit concluded that Utica possessed sufficient facts by the end of February 1979 to have determined that there had been a loss, and therefore, affirmed the district court's decision. *Id.* at 123-24.

Here, the Policy at issue, which falls outside the ambit of Section 3420(a)(5) of the Insurance Law, contains the following unambiguous condition precedent to coverage in Section V.B.3:

> 3. <u>Your Duties in the Event of a Loss</u>
>
> After you **Discover** a loss or a situation that may result in loss of or loss from damage to **Money, Securities** or **Other Property** that exceeds twenty-five percent (25%) of the Single Loss Retention, you must:
>
> a.   notify us as soon as possible;
>
> * * *
> d.   give us a detailed sworn proof of loss within 120 days[.][14]

The Policy, in Section III.Q., defines the term "Discover" as follows:

> Q. **"Discover", "Discovered", or "Discovery"** means the moment when you, your partner or **Management Staff Member:**
>
> 1.   first become(s) aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime Policy** has been or will be incurred, regardless of when the act or acts causing or contributing to

---

[14] Schwartz Dec., Exhibit "A".

<blockquote>
such loss occurred, even though the exact details of loss may not then be known; or
</blockquote>

<blockquote>
2. first receive(s) notice of an actual or potential claim against you alleging facts which if true would constitute a loss under the **Crime Policy**.[15]
</blockquote>

The facts, as alleged in the Plaintiff's Complaint and the documents incorporated by reference therein, indicate that:  on March 1, 2014, the Plaintiff was notified by a former RDC employee that Vanderburgh had received fraudulent kickbacks from RDC on the Project (Cmp. ¶ 16); on March 1, 2014, the Plaintiff contacted two (2) additional RDC employees who both indicated that they believed Vanderburgh had received kickbacks from RDC (Cmp. ¶ 17); and on March 10, 2014, the Plaintiff's Vice President, Mr. Huntress, filed a Police Report with the Las Vegas Metropolitan Police Department, indicating, among other things, that the Plaintiff had "reviewed the paperwork and invoices and discovered fictitious invoices and external overcharges paid to RDC":

<blockquote>
PR [Person Reporting] states his business receive[d] a phone call about a week ago from a previous employee of RDC who claims Brian Vanderburgh had stolen $200,000 – $300,000 from PR when he worked as Project Manager for PR in 2011. PR states he did have a project at sec of N.Rancho/Alexander which is now a VA outpatient clinic in which Brian Vanderburgh was the Project Manager. <u>PR reviewed the paperwork and invoices and discovered fictitious invoices and external overcharges paid to RDC</u>. PR states Brian Vanderburgh works for RDC. One example he had was one of the companies.
</blockquote>

(Cmp. ¶ 18; Schwartz Dec., Exhibit "D") (emphasis added).

The facts, as alleged in the Plaintiff's Complaint and the documents incorporated by reference therein, further indicate that on March 13, 2014, the Plaintiff's Vice President, Mr. Huntress, filed a "Voluntary Statement" with the Las Vegas Metropolitan Police Department

---

[15] *Id.*

stating that a former RDC employee, Greg Hiner, indicated to him which particular invoices were falsified:

> [Greg Hiner] shared with me that his previous employer RDC and our project manager Brian Vanderburgh had been conspiring to pad construction line items with false invoices from vendors. He stated that the invoices easily totaled over $300,000 and that RDC was doing this and making payments to BVD a company owned by our project manager Brian Vanderburgh. He went on to say that at the end of the job when we were reviewing final numbers and attempting to closeout the job, that the invoices we were fighting from Top Notch specifically were falsified…[16]

The facts, as alleged in the Plaintiff's Complaint and the documents incorporated by reference therein, also reveal that the Plaintiff's Vice President, Mr. Huntress, thereafter contacted the NSCB's Director of Investigations, Paul Rozario, *via* letter dated July 3, 2014, to provide documents and information regarding the alleged Vanderburgh/RDC fraud; and that Mr. Huntress also provided a memorandum to Mr. Rozario of the NSCB, indicating, *e.g.,* that prior to the commencement of construction on the Project, the Plaintiff had received an anonymous letter stating that Vanderburgh and RDC had previously been involved in *another* fraudulent scheme on a prior construction project in or about 2012.

Accordingly, the foregoing confirms that the Plaintiff discovered a loss or a situation that may have resulted in a loss on March 1, 2014 (*i.e.,* the date that the Plaintiff spoke with three different RDC personnel regarding the fraud), or, at the latest, March 10, 2014 (*i.e.,* the date that the Plaintiff filed the Police Report with the Las Vegas Metropolitan Police Department, indicating: (1) that the Plaintiff had received information from a former RDC employee that Vanderburgh had stolen $200,000 – $300,000, and (2) that the Plaintiff had reviewed relevant paperwork and invoices and *discovered* the existence of fictitious invoices and external overcharges paid to RDC). However, the Plaintiff failed to provide Travelers with any notice of

---

[16] *Id.*

its claimed loss until approximately <u>eleven (11) months later</u> – an unreasonable delay as a matter of law. *See, e.g., Minasian, supra.*

Pursuant to *Utica*, *supra*, and the terms of the Policy issued by Travelers, to the extent that the Plaintiff may seek to argue that it neglected to submit notice sooner because it had a good faith belief in Vanderburgh's honesty, or that it did not appreciate the significance or understand the full details of the loss (even though it reported the same to the Police), such contentions provide no basis to excuse the Plaintiff's eleven-month delay in providing Travelers with notice – especially in light of the Plaintiff's duty of inquiry, and the information obtained (and confirmed) by the Plaintiff up until that point in time. *See, Utica, supra; see also, Minasian, supra,* (holding that the insured's notice to its insurer of a theft, which was submitted approximately three months after the insured reported the theft to the police, was untimely as a matter of law; and that the insured's contention that its notice obligation was triggered by its subjective understanding of the availability of coverage under its policy was without merit); *see also, Power Auth. v. Westinghouse Elec. Corp.*, 117 A.D.2d at 340 (holding that, "[w]hen the insured indefinitely reserves to itself the determination of whether a particular loss falls within the scope of coverage it does so at its own risk.").

Therefore, as a result of the Plaintiff's failure to comply with conditions precedent to coverage under the Policy (*e.g.,* requiring it to provide timely notice and timely proof of loss), Plaintiff's Complaint should, in accordance with *Utica* and the other authorities cited herein, be dismissed with prejudice for failure to state a claim upon which relief may be granted.

## CONCLUSION

Therefore, based upon the foregoing, Travelers respectfully requests that the Court enter an Order dismissing Plaintiff's Complaint with prejudice, and awarding such other and further relief that may be appropriate and just.

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

_____/s/ Adam R. Schwartz_____
Adam R. Schwartz
Wall Street Plaza
88 Pine Street, 24th Floor
New York, New York 10005
T. (212) 483-9490
F. (212) 483-9209
aschwartz@mdmc-law.com

Dated: New York, NY                         *Attorneys for the Defendant,*
  March 17, 2016                         *Travelers Casualty and Surety Company of America*