UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ACQUEST HOLDINGS, INC.

Plaintiff,

v.

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA

Defendant

---

PLAINTIFF'S MEMORANDUM OF LAW IN
RESPONSE TO DEFENDANT'S MOTION TO
DISMISS
16-cv-00212

---

MICHAEL A. BRADY, ESQ.
DANIEL J. BRADY, ESQ.
HAGERTY & BRADY
Attorneys for Plaintiff
69 Delaware Ave., Suite 1010
Buffalo, NY  14202-3875
Telephone: (716) 856-9443
Fax: (716) 856-0511

DATED: Buffalo, New York
April 21, 2016

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................ii

INTRODUCTION.............................................................................1

STATEMENT OF FACTS....................................................................2

ARGUMENT

Point I.  Defendant's Motion Improperly Includes Extraneous
Documents That May Not Be Considered On A Rule 12(b)(6) Motion....................4

Point II.  The Court Must Exclude Defendant's Extraneous Materials
From Consideration In Deciding Defendant's Motion To Dismiss;
It Is Premature To Convert This Motion To A Motion For Summary
Judgment....................................................................................8

Point III.  Defendant's Motion To Dismiss Must Be Denied
Because It Misapplies The Accepted Rule For Determining
When An Employer Discovers A Loss....................................................9

Point IV.  Defendant's Approach Would Eliminate An Insured's
Duty Of Inquiry And Redefine Discovery As Occurring On Mere
Suspicion, Contrary To The American Surety Standard...............................18

Point V.  Though Discovery Has Not Even Begun, Considering
The Limited Extraneous Documents Available, Plaintiff's Discovery
Of The Loss Is A Question Of Fact....................................................20

CONCLUSION...............................................................................23

## TABLE OF AUTHORITIES

**CASES**

American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc., 367 F.3d 212 (4th Cir. 2004).7

American Sur. Co. v. Pauly, 170 U.S. 133 (1898)........9,10, 11, 12, 14, 15,17, 19, 21, 22, 23

Balkum v. Leonard, 65 F. Supp. 3d 367 (W.D.N.Y. 2014)......................................................5

Block v. Granite State Ins. Co., 963 F. 2d 1127 (8th Cir. 1992)..........................................22

Brooks v. Prack, 77 F. Supp. 3d 301 (W.D.N.Y. 2014)...................................................9, 20

Celotex Corp. v. Catrett, 477 U.S. 317(1986)..........................................................................9

Chambers v. Time Warner, Inc., 282 F. 3d 147 (2d Cir. 2002)................................5, 6, 8, 9

Commodore Intl. v. Nat'l Fire, 184 A.D.2d 19 (1st Dep't 1992)....................................10, 11

Conley v. Gibson, 355 U.S. 41 (1957)...................................................................................8, 9

Cortec Industries, Inc. v. Sum Holding LP, 949 F. 2d 42 (2d Cir.1991)...............................6

Cosmas v. Hassett, 886 F. 2d 8 (2d Cir. 1989)......................................................................6,7

Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012 (1st Cir.1988...............................................6

Gersbacher v. City of New York, No. 1:14-cv-7600-GHW
(S.D.N.Y. September 25, 2015)...............................................................................................5

Global Network Communications v. City of New York, 458 F. 3d 150 (2d Cir. 2006)......6

Goldman v. Belden, 754 F.2d 1059 (2d Cir.1985)..................................................................6

Gulf USA Corp. v. Federal Ins. Co., 259 F.3d 1049 (9th Cir. 2001)...........10, 14, 15, 16, 17

Harris v. City of New York, 186 F.3d 243 (2d Cir.1999)..................................................8, 9

Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292 (2d Cir.2003)...................................9

National Credit Union Administration Board v. Cumis Insurance Society, Inc.,
No. 1:11 CV 1739 (N.D. Ohio April 7, 2015)......................................................................12

<u>Newman & Schwartz v. Asplundh Tree Expert Co.</u>, 102 F.3d 660 (2d Cir. 1996)...........5, 8

<u>Sec. Mut. Ins. v. Acker-Fitzsimons</u>, 31 N.Y. 2d 436 (1972).........................................18, 19

<u>Sira v. Morton</u>, 380 F. 3d 57 (2d Cir. 2004)........................................................................8

<u>Snyder v. Fantasy Interactive, Inc.</u>, No. 11 Civ. 3593(WHP), 2012 WL 569185
(S.D.N.Y. Feb. 9, 2012).......................................................................................................9

<u>United States Fidelity & Guar. Co. v. Empire State Bank</u>, 448 F. 2d 360 (8th Cir. 1971)..12

<u>Utica Mut. Ins. v. Fireman's Fund Ins. Companies</u>, 748 F. 2d 118
(2d Cir. 1984).........................................................................10, 11, 12, 13, 17, 18, 19, 20

<u>Walker v. SWIFT SCRL</u>, 517 F. Supp. 2d 801 (E.D.V.A. 2007).........................................7

**TREATISES**
5A Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> (3d ed.2004).......7

10 Toni Scott Reed and Duncan L. Clore, <u>New Appleman on Insurance Law</u> ...................13

11 Appleman, <u>Insurance Law and Practice,</u>.......................................................................12

13 Couch on Insurance.................................................................................10, 12, 13

Baicker-McKee, Jansen, Corr, <u>Federal Civil Rules Handbook</u>, (2016)................................5

## INTRODUCTION

This is a breach of contract action. Plaintiff Acquest Holdings, Inc. submitted a claim of loss under a crime/fraud policy of insurance issued by defendant Travelers Casualty and Surety Company of America ("Travelers"). The defendant rejected the claim on the grounds it was not timely submitted under the policy. Plaintiff commenced this lawsuit. Defendant has moved to dismiss pursuant to Rule 12(b)(6). This memorandum of law is submitted in opposition to defendant's motion.

Defendant's motion does not attack plaintiff's Complaint itself. Instead, the motion relies on hundreds of pages of extraneous documents which are neither integral to nor properly incorporated by reference in plaintiff's Complaint. Using these documents, defendant imports alleged facts which are not in the Complaint, claiming they prove that plaintiff "discovered" the loss in March 2014 and not, as alleged in the complaint, in December 2014.

In an attempt to escape the viable and straightforward cause of action pled in plaintiff's Complaint, defendant's motion also urges this Court to ignore established precepts of fidelity insurance law, which place the question of an employer's "discovery" of a loss in the hands of a jury, and to abandon the common sense definition of discovery of loss, established by the Supreme Court in the nineteenth century.

As set forth below, defendant's motion to dismiss must be denied because: (1) it is based on documents and alleged facts extrinsic to the Complaint; (2) the determination of when a loss is "discovered" is a fact-intensive question for the jury; (3) plaintiff's Complaint plainly alleges that plaintiff, while suspicious of employee misconduct, did not obtain "known facts" sufficient for it to conclude that it had suffered a loss until December 16, 2014; (4) defendant's approach would eliminate the insured's duty to inquire and redefine "discovery" of a loss in contravention of

1

established caselaw; and (5) even if the Court were to consider defendant's extraneous documents, when plaintiff discovered its loss remains a question fact.

## STATEMENT OF FACTS[1]

In May of 2007, Travelers issued plaintiff a crime policy of insurance, No. 104885918 ("the Policy"), which covered losses associated with several limited categories of crime, including employee theft and fraud. Complaint, at ¶ 4. Plaintiff paid its premium annually, and the Policy was renewed annually, through November 2015. Id., ¶¶ 5-6.

The Policy provided that once plaintiff discovered "a loss or situation that may result in a loss from damage to Money, Securities or Other Property that exceeds twenty-five percent (25%) of the Single Loss retention," it must, among other things, notify defendant as soon as possible, submit to examination under oath at defendant's request, and give a **detailed, sworn** proof of loss within 120 days. Id., at 19. The Policy also defined "discovery" as "the moment [the insured] first become(s) **aware of facts** which would cause a reasonable person to assume that a loss of a type covered by [the Policy] has been or will be incurred…even though the exact details of loss may not then be known." See Exhibit A to Schwartz Declaration, dated March 17, 2016, at Section III. Definitions, Q (emphasis added).

In 2009, plaintiff entered into a contract with the Department of Veterans Affairs to build and lease an outpatient facility in Las Vegas, Nevada. Plaintiff, located in Buffalo, New York, hired Brian Vanderburgh as project manager. Complaint, at ¶ 9. Vanderburgh had worked for plaintiff on previous projects. Id., at ¶ 10. As project manager, Vanderburgh had wide

---

[1] Under standard rules governing a motion to dismiss, Plaintiff's statement of facts is based on "the facts stated in the complaint…or incorporated in the complaint by reference." See infra, at 5-8.

responsibilities: he oversaw all billings from the general contractor and sub-contractors, and he was primarily responsible for the completion of the entire project. Id., at ¶ 13.

Separately, plaintiff engaged a Las Vegas-based company, Recreation Development Company of Las Vegas ("RDC"), as the general contractor on the project. Id., at ¶ 11. The project began in April 2009 and ended in August 2011. Id., at ¶ 8. In December of 2011, plaintiff made its last payments to RDC and sub-contractors. Id., at ¶ 15.

Over two years later, on March 1, 2014, plaintiff's vice president received a telephone call, in which a former employee of RDC alleged that Vanderburgh was paid kickbacks by RDC while acting as project manager on the project. Id., at ¶ 16. Plaintiff promptly contacted two other former RDC employees, who both stated their belief that Vanderburgh had committed embezzlement in conjunction with RDC. Id., at ¶ 17.

Without any substantiation of the allegations of these former RDC employees, plaintiff contacted the Las Vegas Metropolitan Police Department ("LVMPD") on or about March 10, 2014, to report the allegations. Id., at ¶ 18. In April 2014, at the request of the LVMPD, plaintiff gathered business records and sent them to the LVMPD for use in its investigation. Id., at ¶ 21.

Beyond its immediate suspicions, raised by the March 1, 2014 telephone conversations with some former RDC employees, plaintiff did not become "**aware of facts**" regarding Vanderburgh's suspected embezzlement until December 16, 2014. Id., ¶¶ 24-25.

On that day, plaintiff received a copy of a "Notice of Hearing" issued by the Nevada State Contractors Board ("NSCB"). Id., at ¶ 24. The Notice of Hearing was directed at RDC, but was accompanied by hundreds of pages of supporting documents. Id. Among these documents were copies of checks paid by RDC to a consulting company owned by Vanderburgh. This was the first substantiation of the allegations made by the former RDC employees in March. Id., at ¶ 23. At

this point, plaintiff had obtained facts sufficient for it to determine that it had suffered a loss as defined by the Policy. Id.

On February 1, 2015, a few weeks after receiving the hundreds of pages of documents from the NSCB, plaintiff notified Travelers of its recently discovered loss and its claim under the crime policy, even though it still did not know "the exact details of the loss." Id., at ¶ 26. Using the still-limited information contained within the NSCB documents, plaintiff prepared and submitted a "Proof of Loss" as required by the Policy. Id., at ¶ 28. Plaintiff continued to investigate the loss, and on June 4, 2015, submitted a revised "Proof of Loss." Id., at ¶ 29.

Travelers then spent nearly six months analyzing plaintiff's claim, Proof of Loss, and supporting documents. Id., at ¶ 30. On June 29, 2015, Travelers notified plaintiff of its refusal to pay a claim under the Policy, concluding that plaintiff had discovered the loss in March 2014—at the instant when it first became suspicious of a loss. Id.


## ARGUMENT


**Point I. Defendant's Motion Improperly Includes Extraneous Documents That May Not Be Considered On A Rule 12(b)(6) Motion.**

In support of its motion to dismiss, defendant attaches six exhibits: a copy of the Travelers Wrap+ Crime Insurance Policy (No. 104885918) for the policy period of November 9, 2013-November 9, 2014 ("the Policy"); a copy of plaintiff's Proof of Loss submitted February 10, 2015; a copy of plaintiff's revised Proof of Loss submitted June 4, 2015; a copy of a March 10, 2014 Las Vegas Metropolitan Police Department Report ("the Police report"); a copy of the Notice of Hearing served by the Nevada State Contractors Board, dated December 16, 2014, together with

approximately 500 pages of exhibits and supporting documents ("Notice of Hearing"); and a copy of defendant's June 29, 2015 correspondence to plaintiff. See Exhibits A-F, respectively, to the Declaration of Adam R. Schwartz, Esq., dated March 17, 2016. As explained below, with the exception of the Policy (Ex. A), none of these extraneous documents is properly before the Court on this Rule 12(b)(6) motion to dismiss.

A motion to dismiss under Rule 12(b)(6) is a vehicle to test the adequacy of the pleadings. Consequently, "expanding the inquiry to include a consideration of materials outside the pleadings would be inconsistent with those Rules' goals." Baicker-McKee, Jansen, Corr, Federal Civil Rules Handbook, 505 (2016). Thus, as defendant itself admits, in deciding a Rule 12(b)(6) motion to dismiss, a court may only consider "the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Defendant's Memorandum of Law ("MOL") at 5, (citing Balkum v. Leonard, 65 F. Supp. 3d 367, 369 (W.D.N.Y. 2014)).[2]

However, defendant misinterprets and improperly expands what documents may be "incorporated by reference." "[T]he Second Circuit has emphasized that in order for a document extraneous to the complaint to be considered at the motion to dismiss stage, the plaintiff must have relied upon it in drafting the complaint; it is not sufficient that the plaintiff had notice or possession of the document." Gersbacher v. City of New York, No. 1:14-cv-7600-GHW (S.D.N.Y. September 25, 2015) (citing Chambers v. Time Warner, Inc., 282 F. 3d 147 (2d Cir. 2002)).

---

[2]As defendant notes, this Court affirmed this rule in Balkum, expressly relying on Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660 (2d Cir. 1996), in which the Second Circuit *reversed* a trial court's grant of a Rule 12(b)(6) motion because the trial court improperly considered exhibits which were not incorporated in or integral to the complaint.

Because this rule has been vulnerable to misinterpretation, the Second Circuit has taken

pains to explain it. In Cortec Industries, Inc. v. Sum Holding LP, 949 F. 2d 42 (2d Cir.1991), the

Second Circuit stated, generally:

> Rule 10(c) provides: "Statements in a pleading may be adopted by
> reference in a different part of the same pleading or in another
> pleading or in any motion. A copy of any written instrument which
> is an exhibit to a pleading is a part thereof for all purposes."
> Fed.R.Civ.P. 10(c). Relying on Rule 10(c), we have held that the
> complaint is deemed to include any written instrument attached to it
> as an exhibit or any statements or documents incorporated in it by
> reference. See Cosmas, 886 F.2d at 13; Goldman v. Belden, 754
> F.2d 1059, 1065-66 (2d Cir.1985).

Id. at 47. The Second Circuit later clarified this rule: "[b]ecause this standard has been

misinterpreted on occasion, we reiterate here that a **plaintiff's reliance on the terms and effect

of a document in drafting the complaint is a necessary prerequisite to the court's

consideration of the document on a dismissal motion; mere notice or possession is not

enough**." Chambers v. Time Warner, Inc., 282 F. 3d 147, 153 (2d Cir. 2002) (emphasis added).

Importantly, the Second Circuit has been clear that **a pleading's mere reference to a

document or event is not enough** to constitute incorporation by reference. Global Network

Communications v. City of New York, 458 F. 3d 150, 155 (2d Cir. 2006) (citing Fudge v.

Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir.1988) ("Clearly, not every document referred

to in a complaint may be considered incorporated by reference and thus introduced by the moving

party in support of a motion to dismiss")).

**Even quoting** a document is not enough for it to be considered incorporated by reference.

See Goldman v. Belden, 754 F. 2d 1059, 1066 (2d Cir. 1985) ("limited quotation does not

constitute incorporation by reference.") and Cosmas v. Hassett, 886 F. 2d 8, 13 (2d Cir. 1989)

("The amended complaint merely discussed these documents and presented short quotations from

them… Since the [documents] were neither attached as exhibits nor, by only being briefly

excerpted, incorporated by reference, the district court erred in relying in its analysis upon

statements from these documents").

To be incorporated by reference, a document must be central to the claim, not simply

relevant evidence:

> It is certainly true…that documents referred to in a complaint may,
> in certain circumstances, be considered part of the complaint for the
> purpose of evaluating a dismissal motion. See, e.g., American
> Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc., 367 F.3d 212,
> 234 (4th Cir.2004); 5A Charles A. Wright & Arthur R. Miller,
> Federal Practice & Procedure § 1327 (3d ed.2004).[4] **Yet it is
> important to note that this principle does not apply to any and
> all documents that might be referenced in a complaint; rather,
> this principle requires more: it requires that the referenced
> document be central or integral to the claim in the sense that its
> very existence, and not the mere information it contains, gives
> rise to the legal rights asserted.**

Walker v. SWIFT SCRL, 517 F. Supp. 2d 801, 806 (E.D.V.A. 2007) (emphasis added).

Thus, the Policy is properly considered to be incorporated by reference in the Complaint,

as it gives rise to the legal rights asserted in this lawsuit and plaintiff relied on it and quoted

significant portions of it in the Complaint.  However, other than the Policy, the remaining five

documents (Exhibits B-F) submitted with defendant's motion are not integral to the Complaint and

were not relied upon in drafting the Complaint.  None of these five extraneous documents are

quoted in the Complaint, nor does the Complaint state that it is incorporating any of these

documents.  In fact, the Police Report (Exhibit D) is **not even mentioned** in the Complaint.

The proofs of claim submitted by plaintiff, the hundreds of pages of documents submitted

with the Notice of Hearing, the Police Report, and the disclaimer letter of defendant may—with

proper foundation and at some later date—be found to constitute relevant evidence.  But they are

not so central to the claim that they can be said to be incorporated into the Complaint.  See <u>Sira v.</u> <u>Morton</u>, 380 F. 3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint").

**Point II.  The Court Must Exclude Defendant's Extraneous Materials From Consideration In Deciding Defendant's Motion To Dismiss; It Is Premature To Convert This Motion To A Motion For Summary Judgment.**

When a court is presented with extraneous materials on a Rule 12(b)(6) motion to dismiss, Rule 12(d) provides two options:  the Court can exclude the materials outside the pleadings and decide the motion based on the pleadings alone, or it can convert the motion to a Rule 56 motion for summary judgment.  Fed. R. Civ. P. 12(d).[3]  However, when no discovery has taken place, courts routinely decline to convert Rule 12 motions to motions for summary judgment.  See infra, at 9.  The conversion requirement is strictly enforced, at least in part because when a district court considers only certain extra-pleading materials, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record.  <u>Chambers</u>, 154-155.

If the court does not elect to convert the Rule 12(6)(b) motion, it is of course limited to the facts as alleged in the Complaint.  Moreover, "[t]he court is further required to view all allegations raised in the complaint in the light most favorable to the non-moving party…and 'must accept as true all the factual allegations in the complaint.'"  <u>Newman & Schwartz v. Asplundh Tree Expert</u> <u>Co.</u>, 102 F. 3d 660, 662 (2d Cir. 1996) (citations omitted).  Dismissal is "appropriate only if `it appears **beyond doubt** that the plaintiff can prove no set of facts in support of his claim which

---

[3] Travelers' motion does not request that the Court convert its motion to a Rule 56 motion if the Court deems the exhibits attached to the Schwartz declaration to be extraneous to the Complaint.

would entitle him to relief.'" Harris v. City of New York, 186 F.3d 243, 250 (2d Cir.1999) (quoting

Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (emphasis added).

On the other hand, if the Court *does elect to convert* the motion to one for summary

judgment, the Second Circuit has explained that it is "obligated to…give the parties an opportunity

to conduct appropriate discovery and submit the additional supporting material contemplated by

Rule 56." Chambers, at 154.

Further, when no discovery has taken place, courts typically do not convert Rule 12

motions.  As this Court recently held:

> Granting summary judgment against Plaintiff is inappropriate at
> this stage of the litigation because he has not had any opportunity
> to conduct discovery to substantiate his claims. See Celotex Corp.
> v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265
> (1986) (holding that the purpose of summary judgment is to allow
> for disposition of a case "after adequate time for discovery" has
> elapsed); Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292,
> 303 (2d Cir.2003) (stating that summary judgment should only be
> granted after discovery); Snyder v. Fantasy Interactive, Inc., No. 11
> Civ. 3593(WHP), 2012 WL 569185, at *1-2, 2012 U.S. Dist.
> LEXIS 23087, at *3-4 (S.D.N.Y. Feb. 9, 2012) (declining to
> convert motion to dismiss into one for summary judgment because
> plaintiffs had yet to conduct discovery).

Brooks v. Prack, 77 F. Supp. 3d 301, 310-311 (W.D.N.Y. 2014).  No discovery has taken place

in this matter, and conversion to summary judgment is thus premature.

**Point III.   Defendant's Motion To Dismiss Must Be Denied Because It Misapplies The
Accepted Rule For Determining When An Employer Discovers A Loss.**

In the context of a fidelity bond or crime policy of insurance, the Supreme Court defined

"discovery of a loss" more than a century ago: **"[when one] ha[s] knowledge—not simply**

**suspicion—of the existence of such facts as would justify a careful and prudent man in**

9

**charging another with fraud or dishonesty.**" American Sur. Co. v. Pauly, 170 U.S. 133, 147 (1898) (emphasis added). This definition of "discovery" (sometimes referred to as the American Surety standard) has been widely adopted by many circuit courts and states, including New York courts. See Commodore Intl. v. Nat'l Fire, 184 A.D.2d 19, 22 (1st Dep't 1992) ("A loss is 'discovered' once an insured has obtained facts sufficient to cause a reasonable person to recognize that there has been dishonesty or fraud resulting in loss") (citing American Sur. Co. v. Pauly and Utica Mut. Ins. v. Fireman's Fund Ins. Companies, 748 F. 2d 118 (2d Cir. 1984)).[4]

As the Ninth Circuit observed in 2001, more than a century after the Supreme Court's decision, the American Surety standard properly allows an employer the opportunity to be "cautious" to discover facts instead of being forced to leap to conclusions on the basis of suspicions:

> The *American Surety* standard has stood the test of time and it also fares well when reexamined. This standard makes sense because a careful and prudent person does not lightly charge another with committing fraud or an act of dishonesty. Such charges may disrupt the fabric of the employer's workplace and may often set into motion further investigations by responsible governmental agencies and affected parties. If such a charge is later determined incorrect, the employer may be liable for defamation, slander, breach of contract, or other claims. For such reasons, it is reasonable to interpret the fidelity bond's contractual language in a manner permitting the employer to be careful and cautious before asserting that a fraud or dishonesty has occurred.

Gulf USA Corp. v. Federal Ins. Co., 259 F.3d 1049, 1059 (9th Cir. 2001) (discussed further, infra).

---

[4] The Policy's definition of discovery, recited on page 2, supra, tracks standard language in fidelity bonds and crime policies of insurance. See 13 Couch on Insurance, §160:97; Gulf USA Corp., at 1057; American Surety, at 144 (the bond required notice of "any act…'which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer").

The American Surety standard thus means an employer's duty to give notice is not triggered on mere suspicion; the employer must have "obtained facts," which would cause a reasonable person to recognize there had been a fraud or dishonest act, resulting in a loss.  See Commodore, at 22.  Indeed, in American Surety, the Supreme Court affirmed the following jury instruction on the issue of discovery which specifically distinguished "suspicions" from "knowledge of some specific fraudulent or dishonest act":

> It is not sufficient to defeat the plaintiff's right of action upon the policy that it be shown that the plaintiff may have had suspicions of dishonest conduct.... He may have had suspicions of irregularities; he may have had suspicions of fraud, but he **was not bound to act until he had acquired knowledge of some specific, fraudulent or dishonest act** which might involve the defendant in liability for the misconduct.

Id. at 145 (emphasis added).

The Second Circuit has applied this rule as well.  In Utica Mut. Ins. v. Fireman's Fund Ins. Companies, which defendant attempts to portray as analogous to this matter, the Second Circuit followed the American Surety standard, emphasizing the difference between suspicion of misconduct and "obtained facts."  Id. at 122.

Before examining the specific facts of Utica Mutual, it is important to note what it was that the Second Circuit reviewed in that case.  It was not a district court's decision on a motion to dismiss.  It was not even a summary judgment decision.  Instead, in Utica Mutual, the Second Circuit reviewed the trial court's finding after a trial—an implicit acknowledgment that the question of "discovery" is one for the factfinder.  Id., at 119.

Indeed, it is an *established principle* of insurance law that the question of whether an employer has discovered a loss is a question of fact to be determined by the factfinder at trial. As a leading treatise on insurance law puts it:

11

Whether or not the employer discovered a loss is generally a jury question, at least where some evidence tends to show the required degree of knowledge.

In addition, the question whether the insured acquired knowledge from which he or she might reasonably conclude that his or her employee had been committing fraudulent and dishonest acts is a mixed question of law and fact to be submitted to the jury. The trier of fact must determine the underlying facts known to the insured and determine the conclusions which could reasonably be drawn by the insured. In doing so, the jury can look to the subjective conclusions drawn by the insured.

13 Couch on Insurance, 3 ed., §190:14. See also 11 Appleman, Insurance Law and Practice, §6978

("Whether or not the employer prior to the defalcation upon which an action is based had obtained

knowledge of dishonest facts was a question of fact."); National Credit Union Administration

Board v. Cumis Insurance Society, Inc., No. 1:11 CV 1739, at *52 (N.D. Ohio April 7, 2015)

(applying the rule established in American Surety, denying summary judgment on the issue of

discovery, recognizing, "courts interpreting the very same discovery of loss language presented in

the [fidelity] bond herein have construed it as 'anticipating a determination by a trier of fact'");

and United States Fidelity & Guar. Co. v. Empire State Bank, 448 F. 2d 360, 365 (8th Cir. 1971)

("In determining when discovery has taken place, the trier of fact must find the pertinent

underlying facts known to the insured and must further determine subjective conclusions

reasonably drawn therefrom by the insured").

Defendant plainly misapplies the American Surety standard to the facts in the Complaint,

which are readily distinguishable from those in Utica Mutual. In that case, the Second Circuit

emphasized that the plaintiff, Utica Mutual—itself an insurance company[5]—began to suspect

---

[5] As alleged in the Complaint, plaintiff is a Buffalo, NY real estate developer, and was nearly 2000 miles from the site of the project and the alleged fraud. See Complaint at ¶¶ 1-2, 8-13. Utica Mutual, on the other hand, was an insurance company with an audit committee and internal investigatory capabilities. The reasonable person standard requires the factfinder to consider a

misconduct in December 1978 after a new employee reported that Utica Mutual had purchased taxable bonds at much higher than market rates. In January, the president and chairman of Utica Mutual met with the employee who had executed the transaction on behalf of Utica Mutual to discuss the matter. Utica Mutual commenced an investigation, and by the end of February, it had devoted 250 hours to investigating the irregularities. On February 22, 1979, the chairman of Utica Mutual circulated a memorandum outlining the **known facts** to its internal audit committee. At that date, Utica Mutual had **confirmed** that: (1) bonds had been purchased at above market rates, (2) such purchases violated IRS rules, (3) Utica Mutual was faced with certain tax problems because of the adjusted trading, and (4) it suffered a financial loss in the form of excess commissions paid to the broker. Id. at 120. Utica Mutual then waited until July 1979 to report a claim to its insurer. During the intervening time, it continued to investigate, **but did not become aware of or obtain any new facts** regarding the misconduct. Id., 120-121.

As a leading treatise emphasizes, "[o]f significance [in Utica Mutual] was the district court's finding that no new material facts concerning the loss were uncovered between February and July. Thus, the facts upon which [Utica] based its claim were the same facts known to Utica by February." 10 Toni Scott Reed and Duncan L. Clore, New Appleman on Insurance Law, §128.04.

Utica Mutual took the position on appeal that the district court "failed to give adequate consideration to Utica's subjective conclusions concerning the known facts." Utica Mutual, at 121. In other words, **Utica Mutual admitted that it knew the material facts**, but argued that it

---

reasonable person in the shoes of the plaintiff, not with the abilities and resources of Utica Mutual. See 13 Couch on Insurance, 3 ed., § 160:97 ("The reasonable person standard is generally applied based on the custom and usage and knowledge of the reasonable person within the particular profession or occupation involved in the claim").

maintained a good faith and reasonable belief in its employee's honesty until July, and it did not recognize the significance of the facts until that date. Id.

Here, the facts alleged in the Complaint are starkly different: "[u]ntil plaintiff's receipt of the Notice of Hearing from the NSCB and the supporting documents gathered by the NCSB in December 2014, plaintiff suspected a potential fraud and embezzlement, but lacked sufficient knowledge or records to discover a loss." Complaint at ¶ 25. The Complaint does not allege or even imply that plaintiff held a "good faith" belief in Vanderburgh's honesty until December 2014. On the contrary, the Complaint plainly alleges that plaintiff suspected him of criminal acts but did not obtain "known facts" which could have led a reasonable person to conclude that plaintiff suffered a loss until December 2014. Id.

The facts here are more analogous to those in Gulf USA Corp. v. Federal Ins. Co., 259 F.3d 1049 (9th Cir. 2001), a case in which the Ninth Circuit also applied the American Surety standard, affirming that discovery requires more than suspicion. In Gulf, the president of the plaintiff company seriously suspected fraud for **years**, but did not report a loss until he obtained confirmation of his suspicions. Though the factual background to the case is complex, the pertinent facts are these:

A group of officers and directors led by David Rowland, known as the Rowland Group, acquired control of Gulf USA Corporation ("Gulf") in 1989. Led by Rowland, Gulf began acquiring property in New Zealand in 1989. During those real estate transactions, approximately $12 million of Gulf's money was siphoned off to shell corporations set up by the Rowland Group. These transactions were completed in the fall of 1989. Id., 1051-1052.

In 1990, a minority shareholder of another company, City Realties Ltd. ("CRL"), which was negotiating with Gulf for the purposes of merging, commenced a New Zealand Court action

to enjoin the merger on the basis that the shell corporations were related to Gulf. Id. 1052-1053.

Gulf purchased the minority shareholder's shares in CRL for twice the market value and the merger

proceeded.  In May 1990, *Forbes* magazine published an article, which noted that the CRL

minority shareholder "suspected that Rowland took $7 million in improper fees and profits out of

the [New Zealand real estate] deal." Id. at 1053.

In early 1991, a new president took control of Gulf after buying out the Rowland Group.

The new president immediately launched an investigation into the suspected fraudulent

transactions.  Among other actions, the new president authored a memorandum in August 1991,

presented to the Gulf board, in which **he identified several suspected fraudulent transactions**.

Id., 1053-1054.

Almost two years later, on May 5, 1993, Gulf provided its insurance carrier, Federal

Insurance, with notice that on March 8, 1993, Gulf discovered a loss due to unlawful taking of

money by an employee, during one of the suspicious New Zealand real estate transactions.  Gulf

claimed it became aware of the loss after being informed by an outside bank that it had received

$43 million during one of the New Zealand purchases, not the $48 million that was recorded as

Gulf's cost basis.  Federal Insurance denied the claim, and it moved for summary judgment,

claiming, like Travelers does here, that Gulf gave late notice as a matter of law.  The trial court

granted the motion. Id., 1054-1055.

The Ninth Circuit reversed the trial court's decision, applying American Surety:

> Applying the objective *American Surety* standard here, and viewing
> the facts and all reasonable inferences in the light most favorable to
> Gulf, we hold that the district court erroneously determined that
> "there are no genuine, disputed issues of material fact that by
> October 1991, [Gulf's president] had **actual knowledge** of events
> sufficient to trigger Gulf's obligation under the Crime Policy to
> notify Federal that the New Zealand acquisitions may have involved

15

a loss by theft."

Id. 1059-1060 (emphasis added).   Importantly, the Ninth Circuit emphasized the difference

between suspicions and discovery of facts sufficient to trigger the insured's duty to give notice,

finding that when an employer suspects misconduct—even when he *deeply* suspects or "believes"

misconduct has occurred—he has not discovered a loss until he has *obtained facts* sufficient to

conclude that a loss has occurred:

> [T]he district court stated: "This evidence establishes that [Gulf's president] *believed* Rowland had skimmed money off numerous Gulf transactions." (Emphasis added). While [Gulf's president] may well have believed Rowland perpetrated various frauds during his tenure at Gulf, the evidence relied upon by the district court does not establish that [he] had knowledge of sufficient facts to charge that the New Zealand acquisitions involved a theft loss.

Id., at 1060.   The Ninth Circuit also rejected Federal's attempt to trivialize the insured's

confirmation of its suspicions.   During the merger between Gulf and CRL, Saunders, the CRL

CFO, conducted a due diligence inquiry into the New Zealand transactions.  Id. at 1052. Federal

asserted that Gulf did not obtain new facts because the same misconduct was alleged during that

due diligence inquiry in 1990.  The court rejected Federal's attempt at airbrushing the new facts

obtained by Gulf in March 1993:

> The district court also found that the information Saunders learned on March 8, 1993 (the date Gulf claims it "discovered" its loss) "did not differ materially from information [Saunders] obtained during CRL's due diligence inquiry in 1990"—namely, that Citibank received approximately [NZ]$43 million for the Unisys House and not the [NZ]$48 million recorded as Gulf's cost basis...This is an improper inference that the record does not support. In fact, although [the CRL CFO] received a report indicating the author's belief that "nothing was paid...for the preference shares," Saunders testified that "I believe[ed] that they were making an assumption that they couldn't come to, based on what they had there."

16

> When viewed in a light most favorable to Gulf, the evidence demonstrates that there are genuine, disputed issues of material fact as to when Gulf possessed knowledge of the existence of such facts that would justify charging Rowland with dishonesty, fraud, or theft. Because it is unclear when Gulf discovered facts indicating that the New Zealand acquisitions involved a loss by theft, we hold that the district court erroneously granted summary judgment to Federal. **Instead, factual issues pertinent to discovery of loss require trial**.

Id. at 1060 (emphasis added).

The plaintiff in Gulf suspected a loss based on: (1) its own investigation in which it identified the particular transactions; (2) a New Zealand court action alleging misconduct; (3) an outside due diligence inquiry; and (4) **an article published Forbes magazine**, alleging misconduct. Still, the Ninth Circuit, applying the American Surety standard, determined the question of when the plaintiff had obtained facts sufficient to constitute discovery was a question of fact for the jury. The teaching of Gulf is that the issue of when discovery of a loss has occurred is a fact question even if the insured had significant suspicions which were grounded in investigation and reported in the national press.

Here, the Complaint states simply that three former employees alleged that Vanderburgh had received kickbacks from RDC during the project, and that plaintiff was not in a position to confirm those beliefs and suspicions until it obtained specific factual details in December 2014. Applying the American Surety standard - as well as the teaching of Gulf - it was *then* that plaintiff "knew the facts upon which this claim is predicated" and its "suspicions were transformed into knowledge constituting discovery." Utica Mut. at 123.

Indeed, as explained below, defendant's application of the American Surety standard would eradicate plaintiff's duty of inquiry and trigger discovery upon "mere suspicion."

17

**Point IV.  Defendant's Approach Would Eliminate An Insured's Duty Of Inquiry And Redefine Discovery As Occurring On Mere Suspicion, Contrary To The <u>American Surety</u> Standard.**

As the Second Circuit observed in <u>Utica Mutual</u>, New York law imposes a duty of inquiry on the insured. <u>Id</u>. at 122 (citing <u>Sec. Mut. Ins. v. Acker-Fitzsimons</u>, 31 N.Y. 2d 436, 441 (1972)). In <u>Sec Mut. Ins.</u>, the Court of Appeals considered a liability insurance policy for injuries arising from the operation of certain premises, which provided that the insured must give notice to the insurer "as soon as practicable" after an "occurrence." <u>Id</u>. at 439. Briefly, in May 1965, a large fire broke out at the insured's premises. A second large fire broke out in October 1965. The latter fire resulted in injuries to three firemen. The insured heard rumors in November 1965 that three firemen had been injured. <u>Id</u>. In December 1965, the insured read a newspaper article, which stated that two of the firemen had filed a claim with the City of New York for injuries sustained at the October fire and discussed potential liability of the premises owners. <u>Id</u>. at 440. The insured did not give notice to its insurer until June 1967, when it was served with a summons and complaint. <u>Id</u>.

The Court of Appeals examined an insured's duty of inquiry: "[t]here may be circumstances, such as lack of knowledge that an accident has occurred, that will explain or excuse delay in giving notice and show it to be reasonable...[but] [the insured] must exercise reasonable care and diligence to keep himself informed of accidents out of which claims for damages may arise." <u>Id</u>. at 441. Applying the duty of inquiry to the facts, the Court of Appeals pointed to the December newspaper article:

> This article was brought to the attention of the insureds...in late December. While this information was, in our view, sufficient to apprise the insureds of the occurrence, of itself, **it probably was not a sufficient predicate for giving immediate notice**. However, it seems to us that **such information would cause a reasonable and**

> **prudent person to investigate the circumstances, ascertain the facts, and evaluate his potential liability.**

Id. at 442.  The Court of Appeals reasoned that the newspaper article, though itself not enough to trigger the notice requirement, was enough to trigger the insured's duty of inquiry.

In Utica Mutual, the insured's duty of inquiry was triggered in December of 1978, when it first became aware of the suspicious transactions.  Months later, those suspicions were transformed into knowledge after Utica Mutual obtained facts during its 250 hours of investigation.  Id. at 120, 123.

Here, however, defendant urges this Court to hold that plaintiff discovered the loss on March 1, 2014, the first day on which it could be said that plaintiff's duty of inquiry was triggered.  See Defendant's MOL, at 14.[6]  This would require the Court to cast aside the American Surety standard, which explicitly provides that an insured does not discover a loss on mere suspicion.  Additionally, it would require the Court to ignore New York's duty of inquiry, as that duty presumes an insured does not discover a loss on suspicion alone but must make a reasonable investigation of that suspicion.

Here, plaintiff's duty of inquiry may have been triggered in March of 2014 when former employees reported allegations that Vanderburgh had stolen money from plaintiff.  Promptly, and as part of its duty of inquiry, plaintiff contacted law enforcement to investigate the suspected misconduct.

---

[6] Curiously, defendant also submits March 10, 2014, the date of the improperly attached Police Report, as the "latest" possible date of discovery.  Defendant's MOL, at 14.  However, even if one were to assume the authenticity and admissibility of this document and consider its hearsay contents, it is clear that plaintiff obtained no new facts between March 1, 2014 and March 10, 2014.  Thus, applying Utica Mutual, there is no basis for defendant's proposed March 10, 2014 discovery date.

Like the plaintiff in <u>Utica Mutual</u>, plaintiff ultimately obtained facts from which it could conclude a crime had occurred, transforming suspicion into knowledge constituting discovery. As alleged in the Complaint, plaintiff did not obtain these facts until December 2014. Then, unlike the plaintiff in <u>Utica Mutual</u>, plaintiff quickly reported its claim to Travelers after discovering the loss.[7]

**Point V.  Though Discovery Has Not Even Begun, Considering The Limited Extraneous Documents Available, Plaintiff's Discovery Of The Loss Is A Question Of Fact.**

As discussed above, defendant submits hundreds of pages of extraneous material that may not be considered on a motion to dismiss.   No discovery has been conducted, and it would therefore be premature to convert defendant's motion to one for summary judgment. See <u>Brooks</u>, supra, at 310-311.

However, even if this Court were to examine these limited extraneous documents selected by Travelers, it is clear from their contents that plaintiff did not have actual knowledge of a loss or a crime committed by Vanderburgh in March 2014.  Despite Travelers' conclusion that the documents show plaintiff "clearly discovered a loss," from these documents, it is apparent that, at most, plaintiff was aware of two known facts in March 2014: (1) one or more former employees of RDC believed that Vanderburgh stole funds from plaintiff and (2) after review of the paperwork, plaintiff discovered what it believed to be overcharges to RDC.[8]  Defendant's MOL, at 3-4, citing (Exhibits D, and E, at 56-57). **Taken together, these facts did not provide plaintiff any actual**

---

[7] Importantly, plaintiff did not even wait until it had finished its investigation of the loss to report it.  Indeed, defendant continued to investigate the loss after reporting it to defendant, submitting two proofs of loss, one in February 2015, and one in June 2015.  Complaint, ¶ 27-30.

[8] Contrary to the writing of the police officer who apparently prepared the report, Vanderburgh never worked for RDC.

**knowledge that Vanderburgh stole any funds from plaintiff, that he gained any financial**

**benefit from these alleged crimes, or that plaintiff suffered a loss within the meaning of the**

**policy.**[9]

Finally, the conclusions of the LVMPD financial crimes detective who investigated this matter prove that plaintiff's duty to give notice to Travelers was not triggered until December 2014. On August 18, 2014, the detective sent the following email to William Huntress, the president of plaintiff:

> Bill,
>
> After a lengthy investigation, **I am unable to prove Brain Vanderburgh** received any financial gain as a direct result of fraudulent invoices during the VA clinic project. **I can't establish criminal intent on his part, prove he had knowledge of a crime, or benefited from the actions of RDC.** The case you filed with LVMPD is closed.
>
> RDC's role is a separate investigation, which our office does not handle. I can forward my findings to the Nevada Contractors Board and/or NV Attorney General's office for possible investigation.
>
> If you have any questions please let me know.
>
> Sincerely,
>
> Carla O'Connell, CFCI/Detective
> Las Vegas Metropolitan Police Department
> Financial Crimes/Fraud

See Exhibit A to Brady Affidavit (emphasis added). Plaintiff cannot be said to have satisfied the "reasonable person" standard of <u>American Surety</u> when an outside expert, here the LVMPD's

---

[9] As set forth in the Complaint, the crime policy covers limited categories of crimes, including acts committed by employees. Thus, even if plaintiff knew that *RDC* had committed a crime, which the Complaint does not allege, a crime committed by RDC would not be a "loss" under the policy. Complaint, at ¶ 4, Exhibit A at 1-4.

investigating financial crimes detective, after "a lengthy investigation," affirmatively concluded that there was no evidence of a crime committed by Vanderburgh (and thus no evidence of a loss under the Policy).

Indeed, in cases where an insured is informed by outside experts that no loss occurred, courts have held that the insured did not discover the loss until later. In Block v. Granite State Ins. Co., 963 F. 2d 1127, 1131 (8th Cir. 1992), the Eighth Circuit held, "[t]here can be no better evidence that a 'reasonable person' in the position of the insured would not have discovered the loss than the fact that…outside experts did not."[10] Though the outside experts in Block were an attorney and accountant, defendant submits that the expertise of a financial crimes detective would likewise exceed that of a "reasonable person" in the position of the insured. Id., at 1129.

Perhaps aware of the weakness of its "proof" regarding plaintiff's purported "discovery," Travelers repeatedly exaggerates plaintiff's awareness and actions. As alleged in the Complaint, after receiving a phone call from a former employee of RDC alleging Mr. Vanderburgh's receipt of kickbacks from RDC, plaintiff reported the allegations to the LVMPD. Id., at ¶ 16. In its motion, defendant describes plaintiff's act of telephoning the police to report these bare allegations from third parties (with whom plaintiff had no familiarity) as: "[filing] a Police Report," then, incredibly, "[submitting] its **detailed criminal complaint** against its former employee." Defendant's MOL at 2, 10 (emphasis added). Such hyperbole does not transform plaintiff's suspicions into actual knowledge, and defendant's extraneous documents merely suggest that

---

[10] In Block, the Eighth Circuit applied the Missouri rule regarding discovery of a loss, which, identically to American Surety, occurs when "there [were] facts known ... which would lead a reasonable person to an assumption that a [loss occurred]." Id. at 1129.

plaintiff suspected Vanderburgh of misconduct.  But applying the <u>American Surety</u> standard, plaintiff was under no duty to give Travelers notice based on mere suspicion.

Thus, even if this Court were to consider the documents improperly submitted by defendant, there remains a question of fact as to when defendant obtained the facts sufficient for it to reasonably conclude that it had incurred a loss due to Vanderburgh's misconduct.

## CONCLUSION

Defendant's motion to dismiss improperly relies on extraneous documents, despite the fact that discovery has not even begun in this matter.  Further, defendant urges this Court to improperly consider those documents, ignore the established principle of insurance law that discovery of a loss is a question of fact for a jury, and abandon hundreds of years of precedent that an insured's duty to report a loss under a crime policy is triggered by the discovery of actual facts, not suspicions.  Defendant's motion should be denied.

DATED:      Buffalo, New York
            April 21, 2016.

**HAGERTY & BRADY**

BY:  s/  Michael A. Brady
**MICHAEL A. BRADY, ESQ.**
**DANIEL J. BRADY, ESQ.**
Attorneys for Plaintiff
69 Delaware Ave., Suite 1010
Buffalo, NY  14202-3875
(716) 856-9443
